LOCAL 825, INTERNATIONAL UNION OF OPERATING ENGINEERS,
Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

Harter Equipment, Inc., Intervenor.

No. 86–3641.

United States Court of Appeals, Third Circuit.

Argued June 19, 1987.

Decided Sept. 25, 1987.

David Silberman, Laurence Gold (argued), Michael R. Fanning, Intern. Union of Operating Engineers, Washington, D.C., Paul A. Montalbano (argued), David Solomon, Schneider, Cohen, Solomon, Leder and Montalbano, Jersey City, N.J. (Michael H. Gottesman, Robert M. Weinberg, David A. Sklansky, Washington, D.C., of counsel), for petitioner.

Robert E. Allen, Victoria A. Higman (argued), Elliott Moore, Rosemary M. Collyer, N.L.R.B., Washington, D.C., for respondent.

Gerard C. Smetana (argued), Rueberry, Phares, Abramson & Fox, Chicago, Ill., for intervenor.

Before SEITZ, MANSMANN, Circuit Judges and BISSELL, District Judge.*

## OPINION OF THE COURT

MANSMANN, Circuit Judge.

This case comes before us on a petition by Local 825, International Union of Operating Engineers, to review a final order of the National Labor Relations Board, which dismissed an unfair labor practice complaint issued against Harter Equipment, Inc. We find that the Board properly held that the company did not violate Sections

* Honorable John W. Bissell, of the United States District Court for the District of New Jersey, sitting by designation.

8(a)(1) or 8(a)(3), 29 U.S.C. § 158(a)(1) and (3), by hiring temporary employees after lawfully locking out its permanent employees for the sole purpose of applying economic pressure in support of a legitimate bargaining position. Accordingly, we will deny the union's petition for review.

## I.

Harter Equipment, Inc. ("Harter") is a New Jersey corporation engaged in the sale, distribution and service of construction and lawn maintenance equipment. Prior to 1978, Harter was a member of an employer association which was a party to a collective bargaining agreement with Local 825 ("the union"). In 1977, Harter withdrew from the association and entered into a separate collective bargaining agreement with the union, which ran from December 1, 1978 to December 1, 1981. The union represents a unit of the company's employees including parts and service department mechanics, "parts men," a truck driver and a painter.

Negotiations to renew the contract began in October, 1981. From the beginning, the company made it clear that it needed substantial cost concessions because it was operating at a loss. The union's position throughout the negotiations was to extend the existing agreement for up to six months so that work might continue while negotiations progressed. Harter, however, wished to have a new contract executed by the December expiration date and would not permit its employees to work after that date without a contract.[1] The major issues separating the parties were wages and a union security clause.

On the day the contract expired (December 1, 1981), the company submitted a "final" proposal providing, *inter alia*, for certain wage reductions and a union security clause. The union requested that the contract be extended one day to allow the employees to consider the proposal, and the

employees did work on December 2. On December 3, the union rejected the proposal but indicated that the employees desired to continue working without a contract. Harter then refused to permit the employees to punch in or work. On December 4 the employees began picketing the company with signs stating they had been locked out.

Harter and the union continued to negotiate on the union security issue. However, after the withdrawal of proposals made by the union which had been accepted by the company, Harter decided to hire temporary replacements to complete service work already in the shop.

After temporary employees were hired, the parties continued to bargain but no final contract was consummated. The company continued to hire temporary replacements and the union continued to picket until April 1, 1982, when the unfair labor practice charge was filed by the union.

## II.

After a hearing, an Administrative Law Judge concluded that there had been no showing of anti-union animus, and that the company's lockout was instituted to bring economic pressure to bear upon the union. The ALJ reasoned that the lockout was neither inherently destructive of employee rights, inherently prejudicial to union interests, nor devoid of significant economic justification. The ALJ thus found that the use of replacements during the lockout was legitimate.

On appeal the National Labor Relations Board agreed with the ALJ. The Board held that absent specific proof of anti-union animus, an employer does not violate § 8(a)(1) or 8(a)(3) by hiring temporary replacements in order to engage in business operations during an otherwise lawful lockout, including a lockout initiated for the sole purpose of bringing economic pressure

---

**1.** The company insisted on a contract by December 1 because 1) the president, Seth Harter, feared that the union would demand the same terms as the association contract if the company's agreement was extended beyond the expiration date of the association contract; 2) the

company sought to reduce its wage and fringe benefit payments, and extension of the contract's high wages and benefits would not relieve any financial difficulties and 3) the company feared a strike and wanted the protection of a no strike clause.

to bear in support of a legitimate bargaining position. This petition for review followed.

Our jurisdiction is predicated upon § 10(f) of the NLRA, 29 U.S.C. § 160(f) (1982). The Board's findings of fact are conclusive if supported by substantial evidence on the record considered as a whole. *Universal Camera Corporation v. N.L.R.B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Review of the Board's application of legal precepts to the facts is plenary. *Albritton Communications Co. v. N.L.R.B.*, 766 F.2d 812 (3d Cir.1985), *cert. denied*, 474 U.S. 1081, 106 S.Ct. 850, 88 L.Ed.2d 891 (1986). We are mindful of the deference owed to the Board's special expertise in interpreting the Act. *E.I. DuPont de Nemours & Co. v. N.L.R.B.*, 733 F.2d 296 (3d Cir.1984). However, as we noted in *Director, Office of Workers' Compensation Programs v. Mangifest*, 826 F.2d 1318, 1325 (3d Cir.1987), the deference owed to an agency construction of a statute depends substantially on the persuasiveness of the agency view. A position without reasoning has little power to persuade. Moreover, "where, as here, the review is not a question of fact, but of a judgment as to the proper balance to be struck between conflicting interests, '[t]he deference owed to an expert tribunal cannot be allowed to slip into a judicial' inertia which results in the unauthorized assumption by an agency of major policy decision properly made by Congress." *National Labor Relations Board v. Brown*, 380 U.S. 278, 292, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965), citing *American Ship Building v. Labor Board*, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965).

### III.

The union argues that an employer violates § 8(a)(3) of the Labor Management Relations Act when temporary employees are hired during a lockout implemented solely to put economic pressure to bear on the Union. The union contends that such employer conduct is inherently discriminatory, and that the Board erred as a matter of law in considering this conduct to involve such a comparatively slight impact on employee rights that specific proof of anti-union animus was required to demonstrate a violation of the Act. The union also claims that the Board erred in failing to treat the § 8(a)(1) claim. In response, the Board asserts that § 8(a)(1) and § 8(a)(3) do not proscribe the Company's actions in this case.

We begin our analysis with a review of Supreme Court cases dealing with lockouts.

In two cases decided the same day, the Court discussed the legality of an employer's use of a lockout, and the requisite showing of intent under § 8(a)(3) and 8(a)(1). In *National Labor Relations Board v. Brown Food Store*, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (*"Brown"*), the Court considered a situation in which a multiemployer bargaining group locked out its employees after the union struck one member of the group. The employers, including the "struck" employer, continued to operate using temporary replacements. In that case, the N.L.R.B. had found that the employer's conduct carried with it its own indicia of unlawful intent, thereby constituting it an unfair labor practice. The Court disagreed.

In the context of a whipsaw strike, the Court found that the employer's conduct was not demonstrably destructive of employee rights. First, the Court found that a lockout was not an unfair labor practice when used simply as a means of bringing pressure upon the union after an impasse in bargaining negotiations has been reached. *Brown*, 380 U.S. at 284, 85 S.Ct. at 984, citing *American Ship Building Co. v. N.L.R.B.*, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965) (*"American Ship"*). The Court found that when an employer practice is inherently destructive of employee rights and is not justified by the service of important business ends, no specific evidence of intent to discourage union membership is necessary. *Brown*, 380 U.S. at 287, 85 S.Ct. at 986. "But, where the tendency to discourage union membership is comparatively slight and the employer's conduct is reasonably adapted to achieve legitimate business ends or to deal with business exigencies ... the improper

motivation of the employer[s] must be established by independent evidence." *Brown,* 380 U.S. at 287–288, 85 S.Ct. at 986.

The Court found that the use of temporary, nonunion personnel was discriminatory, but that the resulting tendency to discourage union membership was comparatively remote, and that it was a measure reasonably adapted to the effectuation of a legitimate business end. As such, the employer's conduct was prima facie lawful and a showing of improper subjective intent was necessary for a § 8(a)(3) violation.

It was in *American Ship Building,* 380 U.S. 300, 85 S.Ct. 955, that the Court expressly held that a lockout for the purpose of applying pressure on the union, after an impasse in negotiations, is not an unfair labor practice under § 8(a)(1) and (3). In *American Ship* though, the Court expressly intimated no view as to the consequences which would follow if the employer replaced the employees with permanent replacements or temporary help. *American Ship,* 380 U.S. at 308 fn. 8, 85 S.Ct. at 962 fn. 8.

The Court did note that the Board did not have general authority to assess the relative economic power of the adversaries in the bargaining process, and to deny weapons to one party or the other because of the Board's assessment of that party's bargaining power. *American Ship,* 380 U.S. at 317, 85 S.Ct. at 966–967. Thus the Board may not enter into the "substantive" aspects of "balancing" economic weapons or bargaining powers, but must assess instead the impact of the use of the parties' weapons. *American Ship,* 380 U.S. at 317–318, 85 S.Ct. at 967.

The Court has thus articulated a framework within which to evaluate violations of § 8(a)(1) and § 8(a)(3) within the context of a lockout. If the action is inherently destructive of employee rights, no finding of specific proof of anti-union animus will be required. However, if the conduct had only a comparatively slight impact on employee rights, anti-union motivation must be proved after the employer has come forward with evidence of legitimate and substantial justifications for the conduct.

## IV.

The issue presented to us is thus precisely the question left open in *Brown* and *American Ship,* namely, the effect of hiring temporary replacements during a concededly lawful lockout of the employees of a single employer.

Few of our sister circuits have had the opportunity to address this issue. Our research has yielded only two cases wherein the question has arisen directly. In *Inland Trucking Co. v. N.L.R.B.,* 440 F.2d 562 (7th Cir.1971), the court held that a lockout becomes inconsistent with protected employee rights when the employer does not shut down, but continues operations with temporary replacements. Such a lockout, it was found, forecloses the employees' opportunity to earn without surrendering the corresponding opportunity of the employer. *Id.* at 564. The court concluded that a lockout under the circumstances at bar accompanied by continued operation with replacement labor was a per se violation of § 8(a)(1) of the NLRA.

Refusing to adopt the per se rule formulated in *Inland Trucking,* the court in *Inter-Collegiate Press, Graphic Arts Division v. N.L.R.B.,* 486 F.2d 837 (8th Cir. 1973), *cert. denied,* 416 U.S. 938, 94 S.Ct. 1939, 40 L.Ed.2d 288 (1974), found no violation of § 8(a)(1) where the company hired temporary employees during a lockout. The court reasoned that while there is coercion present when an employer locks out his employees, and the coercion may be magnified when the employer continues to operate with temporary employees, the coercion is to force acceptance of the employer's bargaining position, not to foreclose the employees' opportunity to exercise protected rights. *Id.* at 846. Citing *American Ship Building,* the court stated:

Proper analysis of the problem demands that the simple intention to support the employer's bargaining position as to compensation and the like be distinguished from a hostility to the process of collective bargaining....

*Id.* at 846.

In this regard, the NLRB notes that they specifically approved the use of temporary

employees during a lockout in *Ottawa Silica Co.*, 197 N.L.R.B. No. 53, *enf'd*, 482 F.2d 945 (6th Cir.1973). Moreover, in the Board's decision here the Board specifically overruled its prior opinion in *Inland Trucking* insofar as it was inconsistent with this case.

We turn now to an examination of whether the use of temporary replacements here by Harter is inherently destructive of employee rights. The Court has defined conduct which is inherently destructive of employee rights as conduct which carries with it unavoidable consequences which the employer not only foresaw but which he must have intended. In that respect, the conduct would bear its own indicia of intent. *See N.L.R.B. v. Great Dane Trailers*, 388 U.S. 26, 33, 87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027 (1967). We bear in mind that § 8(a)(3) proscribes action impinging on the employees' rights to bargain collectively, strike, or engage in union activities.

In this case, the Company made it clearly known from the beginning of the negotiating sessions that while it desired an amicable renegotiation of its contract, it could not afford major wage concessions because of its declining economic fortunes. Indeed, many of the proposals suggested to the union contained less favorable terms than had been incorporated in the agreement due to expire. It was the company's intention to return the regular employees to work when the negotiations were completed, even though the advertisements for the temporary help did not state that the positions were temporary. On these facts, the ALJ concluded that the lockout occurred in support of the company's bargaining position and that there was no proof of anti-union animus.

■ We cannot find that such use of temporary employees was inherently destructive of the employees' rights to bargain collectively, strike, or engage in union activities. The use of the replacements during the lockout was a tactic chosen by the employer obviously to put pressure upon the union. Such pressure, however, affects the realities of the union's bargaining positions rather than any right as such to bargain collectively, strike or engage in other concerted activity. As the Supreme Court has noted for example, in respect to a strike, vis-a-vis lockouts, the union has no right to determine exclusively the timing and duration of all work stoppages. *See American Ship*, 380 U.S. at 310, 85 S.Ct. at 963.

The pressure Harter brought to bear in this case also was not destructive of the employees' rights due to the use of temporary employees. In *Inter-Collegiate Press*, 486 F.2d 837, the court noted three considerations in evaluating whether the use of temporary replacements had an inherently destructive or comparatively slight effect on employee rights. The court considered the duration of temporary employment and whether a definite date of termination had been communicated to the union and employees, and found that a definite date of duration for the temporary hires had been communicated. Second, the court noted that the option of returning to work was available to the employees upon their acceptance of the employer's terms, and third, the employer had agreed to continue in effect the union-security clause from the old contract.

In this case, the ALJ considered these factors and found that although the advertisements for the replacement workers did not state that the positions were temporary, it was indeed the company's intention to return the regular employees to work at the conclusion of the dispute. In regard to the second factor, the ALJ relied on the language in *Ottawa Silica* and found that the union could have returned its members to work on terms less profitable than desired. As for the union-security clause, the company had agreed to the latest of a series of union proposed security clauses, only to have it withdrawn by the union. Thus, the company in effect had agreed to such a clause.

Under these circumstances, we do not believe that the company's conduct was inherently destructive of employee rights. The "balance of power" between the union and the company may have tilted toward the company through the use of this type of pressure tactic, but as the Board noted, replacing the employees with temporary workers has no greater adverse effect on

the right to bargain collectively than the concededly lawful lockout.

■ Given this finding, "if the adverse effect of the discriminatory conduct on employee rights is 'comparatively slight' an antiunion motivation must be proved to sustain the charge if the employer has come forward with evidence of legitimate and substantial business justifications for the conduct." *N.L.R.B. v. Great Dane Trailers*, 388 U.S. at 34, 87 S.Ct. at 1798. Thus, the "slight" impact on employee rights (to organize, etc.) which the conduct at issue arguably had, is negated if the employer has established a legitimate and substantial business justification for his conduct. *Great Dane*, 388 U.S. at 34, 87 S.Ct. at 1798. Here, that standard has been met. The ALJ specifically found that the Company was in financial straits and that the union was aware of its financial problems. Moreover, no temporary· replacements were hired until six weeks after the commencement of the lockout, during which period no unit work was performed. These facts are not clearly erroneous. With respect to the application of legal precepts to the facts as found, we find that a legitimate business justification existed in this case and that no violation of § 8(a)(1) or § 8(a)(3) occurred.

### V.

The union argues finally that the Board erred in failing to assess adequately the company's conduct in terms of § 8(a)(1). That section makes it unlawful for an employer to interfere with, restrain, or coerce employees in the exercise of their rights to form, join or assist labor organizations. In the seminal cases establishing the legitimacy of the lockout, however, the Supreme Court analyzed this practice in terms of §§ 8(a)(1) and 8(a)(3) in a congruent fashion.

In *Brown* and *American Ship* the Court found that both § 8(a)(1) and § 8(a)(3) require a hostile motive on the employer's part to establish a violation. Thus in *Brown*, the Court stated:

in the absence of evidentiary findings of hostile motive, there is no support for the conclusion that respondents violated § 8(a)(1).... analogous to the determination of unfair practices under § 8(a)(1), when an employer practice is inherently destructive of employee rights and is not justified by the service of important business ends, no specific evidence of intent to discourage union membership is necessary to establish a violation of § 8(a)(3). *Brown*, 380 U.S. at 286–287, 85 S.Ct. at 985–986. Similarly, in *Inter-Collegiate Press*, the court noted that the principles enunciated in *Great Dane Trailers* for establishing a § 8(a)(3) violation were applicable in determining whether a § 8(a)(1) violation existed as well.

■ We therefore find no error in the Board's analysis, which simultaneously discussed the potential violation of §§ 8(a)(1) and 8(a)(3).

### VI.

Accordingly, we will deny the union's petition for review.