**INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIPBUILDERS, BLACKSMITHS, FORGERS AND HELPERS, AFL–CIO, LOCAL 88, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**National Gypsum Co., Inc., et al., Intervenors.**

**No. 87–1189.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 12, 1988.

Decided Sept. 30, 1988.

---

Robert G. Rothstein, of the Bar of the Supreme Court of Pennsylvania, pro hac vice, by special leave of court, with whom Michael N. Katz, Philadelphia, Pa., was on the brief, for petitioner. Bernard N. Katz, Philadelphia, Pa., also entered an appearance for petitioner.

Linda Dreeben, Attorney, N.L.R.B., with whom Aileen A. Armstrong, Deputy Associate Gen. Counsel and Victoria A. Higman, Attorney, N.L.R.B., Washington, D.C., were on the brief, for respondent. Elliott Moore, Attorney, N.L.R.B., Washington, D.C., also entered an appearance for respondent.

James J. Sullivan, Jr., Philadelphia, Pa., for intervenors, Nat. Gypsum Co., Inc., et al.

Before ROBINSON, GINSBURG, and BOGGS,* Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

This case raises the issue that the Supreme Court expressly reserved in *American Ship Building Co. v. NLRB*, 380 U.S. 300, 308 n. 8, 85 S.Ct. 955, 962 n. 8, 13 L.Ed.2d 855 (1965): Does an employer that has lawfully locked out its permanent employees violate sections 8(a)(1) and (3) of the National Labor Relations Act by operating with temporary replacement workers in order to bring economic pressure to bear in support of its bargaining position? The National Labor Relations Board held that it does not, and we agree.

I. FACTS

The Gold Bond Building Products Division of the National Gypsum Company, Inc., manufactures and distributes wallboard at 18 plants nationwide. The International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers represents employees at nine of those plants, including the one in Portsmouth, New Hampshire.

* The Honorable Danny J. Boggs, of the United States Court of Appeals for the Sixth Circuit, sitting by designation pursuant to 28 U.S.C. 291(a).

Over the course of a nearly 40–year relationship at Portsmouth, both the Company and the Union have periodically resorted to economic pressure to support their respective positions in collective bargaining. On several occasions, the Union has attempted to maximize its bargaining power by coordinating its efforts with unions representing other Gold Bond plants, seeking common contract terms and expiration dates at each of the plants. In support of their ultimately unsuccessful demand for coordinated bargaining, the Portsmouth employees and those at three other Gold Bond plants went out on strike in 1969. In 1973, the Company locked out employees at Portsmouth and. at several other plants over the same issue. After another lockout in 1975, however, the Company and the Union were able to reach agreement on the next three biennial contracts without resort to strikes or lockouts.

The last of those contracts was due to expire on April 1, 1983; preliminary negotiations for a new agreement began on March 15 of that year. The Union submitted 67 proposals, but its principal demands were for a "$1 per hour across the board" wage increase, a 100% increase in the multiplier used to compute pension benefits, increases in vacations and paid holidays, and a one-year contract term. The Company's major proposals, among 41, were for a more specific (or, per the Union, a "more pervasive") management rights clause, and for an insurance cost containment clause, which would have capped at the existing rate the Company's obligation to pay for employee health insurance.

Because the Union's chief negotiators were not available to meet with the Company earlier, no substantive bargaining occurred until March 28, just four days prior to the expiration of the contract. As of March 30, the parties had still not resolved any of the major substantive issues that divided them. That day, the Company informed the Union that it would lock the employees out unless a new agreement was reached before the old contract expired at midnight the next night.

The following morning, the Company submitted its "final offer," which still contained the troublesome management rights and insurance cost containment clauses, but included a slight increase in pension benefits and a wage increase of $.32 per hour upon ratification, and an additional $.32 per hour during the second year of the contract. That afternoon, the employees overwhelmingly rejected the Company's final offer. Later that day, at a final pre-expiration meeting, the Union proposed a two-year agreement, with an immediate wage increase of $.50 per hour and another of $.50 at the beginning of the second year. The Company, however, continued to insist upon the management rights and insurance cost containment provisions.

The next day, April 1, the Company made good its threat and locked out its union employees. During the first four days of the lockout, it used supervisory and non-union salaried employees to perform major maintenance work on its equipment. Then, for the next six weeks, the plant operated on a truncated schedule with supervisory and non-union salaried employees from various Gold Bond plants. Near the end of that period, the Union further modified its bargaining position—by reducing its wage increase demand from $.50 to $.495 each year.

Faced with the possibility of strikes at other plants, and a substantial increase in the cost of bringing nonunion employees from other locations to Portsmouth during the busy resort season there, the Company began to hire temporary employees to operate the Portsmouth plant. It specifically informed them that their jobs would last only until an agreement could be reached with the Union.

Meanwhile, the Union and the Company continued to bargain. On July 29, they agreed to a new contract. It provided for an immediate $.35 per hour wage increase, another $.35 per hour raise beginning on April 1 of the next year, and a modest increase in the pension multiplier; and although it did authorize the Company to switch to a health insurance plan that was less costly initially, it required the Compa-

ny to pay any cost increases necessary to maintain the plan during the term of the agreement. The Company dropped its proposed management rights clause. Immediately after the agreement was reached, the replacements were dismissed, and the regular employees, after a four-month lockout, returned to work on August 1.

Seeking to recover the wages lost during the lockout, the Union filed an unfair labor practice charge against Gold Bond. The General Counsel of the NLRB issued a complaint alleging that, by continuing to operate with temporary replacements during an otherwise lawful lockout, the Company had violated sections 8(a)(1) and (3) of the Labor Act, 29 U.S.C. §§ 158(a)(1), (3) (1982).

An Administrative Law Judge (ALJ) held in favor of the Union. The ALJ found that, although the Company's actions were not "inherently destructive" of protected employee rights, they nevertheless had an adverse impact on those rights. Therefore, he reasoned, the case turned on whether the Company had a substantial business justification for hiring replacements during the lockout. The ALJ rejected the Company's contention that, in view of the Union's "dilatory" bargaining tactics, the employees appeared to be gearing up for another coordinated bargaining effort, and therefore, that Gold Bond's actions had been "defensive." The ALJ determined, instead, that Gold Bond's actions were "strictly an offensive maneuver designed to force the Union to capitulate" in the face of the Company's bargaining demands. On the view that the use of economic pressure in order to secure more favorable contract terms is not itself a substantial business justification, he concluded that the Company had violated sections 8(a)(1) and (3) of the Labor Act.

The NLRB reversed on the basis of its decision in *Harter Equipment, Inc.*, 280 N.L.R.B. No. 71 (June 24, 1986), *enforced sub nom. Local 825, International Union of Operating Engineers v. NLRB*, 829 F.2d 458 (3d Cir.1987), which had issued after the ALJ filed his decision in this case. In *Harter*, the Board concluded that "using temporary employees after a lawful lockout in order to bring economic pressure to bear in support of legitimate bargaining demands (1) is a measure reasonably adapted to the achievement of a legitimate employer interest and (2) has only a comparatively slight adverse effect on protected employee rights." 280 N.L.R.B. No. 71 at 10. Accordingly, it held, such an action is unlawful only if it is shown to be the product of an "antiunion motivation." In this regard, the Board agreed with the ALJ that, after locking out its employees, the Company had continued to operate with temporaries for the sole purpose of strengthening its bargaining position. There being no proof that the Company had been motivated by antiunion animus, the Board dismissed the complaint.

The Union petitioned for review in this court, and the Company has intervened.

## II.  ANALYTIC FRAMEWORK

The NLRB argues that we must defer to its decision in this case unless we find it to be " 'fundamentally inconsistent with the structure of the [Labor] Act.' " *Ford Motor Co. v. NLRB*, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979) (quoting *American Ship Building*, 380 U.S. at 318, 85 S.Ct. at 967). Of course, we cannot gainsay that cases such as this one, requiring a proper construction of that Act, are peculiarly within the province of the NLRB. *See NLRB v. United Food and Commercial Workers Union, Local 23,* —— U.S. ——, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987) (applying the analysis of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), to review of the NLRB's interpretation of the Labor Act). Judicial deference is not a necessary factor in our resolution of this case, however, inasmuch as the conclusion reached by the NLRB appears to be compelled by the logic of the relevant Supreme Court decisions.

### A.  Background

The question whether an employer may lawfully lock out its employees has arisen

in three types of recurring situations. In each, it was first established that a lockout is lawful. In each, the corollary question then arose: is an employer that has locked out its employees required to shut down its operations or may it lawfully continue to operate with temporary replacements until it reaches a settlement with its permanent employees? In two of these recurring situations, the right of an employer to hire temporary replacements is clear. It is the third situation that is now before us.

The first situation involves "economic" lockouts, *i.e.*, lockouts necessary to protect an employer from some peculiar economic harm that it would suffer if its employees, who have threatened to strike, were to have sole control over the timing of any work stoppage. For many years, it has been clear that such a lockout is not an unfair labor practice. *See Deluth Bottling Association*, 48 N.L.R.B. 1335 (1943) (lockout to protect against spoilage of materials that would be caused by a sudden strike); *Betts Cadillac Olds, Inc.*, 96 N.L.R.B. 268, 286 (1951) (lockout to avert possibility of strike occurring while unfinished work was in the shop: "The pedestrian need not wait to be struck before leaping for the curb."). It has now been established as well that an employer engaged in such a lawful "economic" lockout may continue to operate with temporary replacements. *See Inter–Collegiate Press, Graphic Arts Division v. NLRB*, 486 F.2d 837 (8th Cir.1973) (lockout and hiring of temporary replacements not an unfair labor practice where employer in highly seasonal business threatened with strike during peak season).

The second situation involves the so-called "whipsaw strike." In such a strike, the union strikes against one member of a multiemployer bargaining unit, but allows the other employers to continue operating in order to maximize the competitive pressure brought to bear upon the struck member, while minimizing the burden of joblessness on the employees' resources; the idea is thereby to force each employer individually to capitulate through a series of such strikes, thus defeating their attempt to stand together. In *NLRB v. Truck Drivers Union*, 353 U.S. 87, 77 S.Ct. 643, 1

L.Ed.2d 676 (1957), the Supreme Court held that it is not an unfair labor practice for the nonstruck members to lock out their employees in order to defend against the tactic. Then, in *NLRB v. Brown*, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965), the Court answered the corollary question, finding that, in the face of a whipsaw strike, an employer may hire temporary replacements to operate its business during the course of an otherwise lawful lockout.

In the parlance of NLRB cases, lockouts in these first two situations are said to be "defensive": the employers are defending against either a whipsaw strike or the prospect that employees will stop work when the effect on the employer will be particularly devastating. The third situation involves the use of a so-called "offensive" or "bargaining" lockout, in which an employer locks out its employees for the sole purpose of using economic pressure to strengthen its position in bargaining with the union. For many years, the NLRB maintained that such lockouts were unlawful under the Labor Act, but in *American Ship Building*, the Supreme Court disapproved that view, holding that "an employer violates neither § 8(a)(1) nor § 8(a)(3) when, after a bargaining impasse has been reached, he temporarily shuts down his plant and lays off his employees for the sole purpose of bringing economic pressure to bear in support of his legitimate bargaining position." 380 U.S. at 318, 85 S.Ct. at 967. Thus, the Court concluded, a lockout is unlawful under the Labor Act only if motivated by antiunion animus.

In *American Ship Building*, 380 U.S. at 308 n. 8, 85 S.Ct. at 962 n. 8, the Court expressly reserved the question whether an employer engaged in a bargaining lockout may hire temporary replacements "for the sole purpose of bringing economic pressure to bear in support of [its] legitimate bargaining position," *id.* at 318, 85 S.Ct. at 967, *i.e.*, apart from any other business justification. This question has twice before reached the courts of appeals in the more than 20 years since *American Ship Building*. In *Inland Trucking Co. v. NLRB*, 440 F.2d 562, 565 (7th Cir.1971), the

Seventh Circuit held that a bargaining "lockout ... accompanied by continued operation with [temporary] replacement labor, is per se, an interference with protected employee rights, and, accordingly, per se, an unfair labor practice." Just last year, on the other hand, the Third Circuit, affirming the Board's decision in *Harter*, appears to have adopted the contrary view. *See Local 825*, 829 F.2d at 458–59. *But cf. id.* at 463.

### B. The Supreme Court's Analysis of Sections 8(a)(1) and (3)

Section 7 of the Labor Act assures employees of the rights to "self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities." 29 U.S.C. § 157 (1982). Section 8(a)(1) of the Act provides that "[i]t shall be an unfair labor practice for an employer ... to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7]." *Id.* at § 158(a)(1). Section 8(a)(3) makes it an unfair labor practice "for an employer ... by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization...." *Id.* at 158(a)(3). As commentators have pointed out, however, "it has been universally recognized that any violation of [Section 8(a)(3)] must also, automatically, constitute a violation of Section 8(a)(1)." Christensen & Svanoe, *Motive and Intent in the Commission of Unfair Labor Practices: The Supreme Court and the Fictive Formality*, 77 Yale L.J. 1269, 1324 (1968).

Accordingly, the Supreme Court has fashioned a single framework for analyzing alleged unfair practice violations in cases such as this one, where the employer is charged with violations of both sections 8(a)(1) and 8(a)(3). *See NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 378, 88 S.Ct. 543, 546, 19 L.Ed.2d 614 (1967).[1]

■ As a general rule, an employer does not violate either section unless its action is motivated by an antiunion animus. On the other hand, "[w]hen specific evidence of a subjective intent to discriminate or to encourage or discourage union membership is shown, and found, [even] otherwise innocent or ambiguous actions which are normally incident to the conduct of a business may, without more, be converted into unfair labor practices." *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 227, 83 S.Ct. 1139, 1145, 10 L.Ed.2d 308 (1963).

There are two situations in which antiunion motivation can be inferred, and need not be proved:

First, if it can reasonably be concluded that the employer's discriminatory conduct was *"inherently destructive"* of important employee rights, no proof of an antiunion motivation is needed and the Board can find an unfair labor practice even if the employer introduces evidence that the conduct was motivated by business considerations. Second, if the adverse effect of the discriminatory conduct on employee rights is *"comparatively slight,"* an antiunion motivation [need not] be proved to sustain the charge [unless] the employer has come forward with evidence of legitimate and substantial business justifications for the conduct.

*NLRB v. Great Dane Trailers*, 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027 (1967) (emphases added).

It is clear that the Supreme Court intended the phrases "inherently destructive" and "comparatively slight" to encompass the universe of employer actions that have any non-trivial, adverse effect on employee

---

1. In *NLRB v. Great Dane Trailers*, 388 U.S. 26, 32, 87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027 (1967), the Court noted that, although the employer was charged with having violated both section 8(a)(1) and section 8(a)(3), "[t]he unfair labor practice charge here is grounded primarily in § 8(a)(3)." It therefore proceeded to analyze the employer's conduct only under that section.

In *Fleetwood Trailer*, however, the Court made it clear that the analysis of *Great Dane* is equally applicable to section 8(a)(1), and that both sections should be considered together under that analysis. *See also* Christensen & Svanoe, *supra* p. 761, at 1324–25 (application of different tests for each section inconsistent with congressional design).

rights. Thus, there is no undistributed middle: "comparatively slight" simply means "less than inherently destructive." Accordingly, if an employer's action is not "inherently destructive" of employee rights, and if the employer provides a legitimate and substantial business justification for its action, then "an affirmative showing of improper motivation must be made" to sustain an unfair labor practice charge.[2] *Id.* at 34, 87 S.Ct. at 1798.

### III. ANALYSIS

First, we examine whether the Company's conduct in this case was inherently destructive of the rights of its employees. Finding that it was not, but that it did have a comparatively slight adverse impact on those rights, we then turn to the question whether the Company had a legitimate and substantial business justification for its actions.

### A. *Was the Conduct Inherently Destructive of Employee Rights?*

#### 1. Collective Bargaining Process Not Impaired

■ Our first task, then, is "to tread the uneasy path between 'inherently destructive' and 'comparatively slight' discrimination." *See Allied Industrial Workers, Local No. 289 v. NLRB,* 476 F.2d 868, 878 (D.C.Cir.1973). That path is dimly lit, but

the Supreme Court has shed this much light on the way: inherently destructive conduct "carries with it 'unavoidable consequences which the employer not only foresaw but which he must have intended' and thus bears 'its own indicia of intent.' " *Great Dane,* 388 U.S. at 33, 87 S.Ct. at 1797 (quoting *Erie Resistor,* 373 U.S. at 228, 231, 83 S.Ct. at 1147). Additional illumination comes from a review of the cases in which an employer's action has been found to be on the wrong side of the "inherently destructive" foul line. As the Ninth Circuit has observed, however, such cases are "relatively rare," *Loomis Courier Service, Inc. v. NLRB,* 595 F.2d 491, 495 (9th Cir.1979), which is itself enlightening.

In *Radio Officers' Union v. NLRB,* 347 U.S. 17, 45, 74 S.Ct. 323, 338, 98 L.Ed. 455 (1954), the Court viewed as inherently destructive "discharges and suspensions of employees under company 'no solicitation' rules for soliciting union membership"; in a *dictum* in *American Ship Building,* 380 U.S. at 309, 85 S.Ct. at 962, it suggested that "permanently discharg[ing] unionized staff and replac[ing] them with employees known to be possessed of a violent anti-union animus" would also fall into that category; and in *Erie Resistor,* the Court held that the grant of 20 years' super-seniority to strike replacements and to strikers who returned to work was also inher-

---

**2.** In a dictum in *Lane v. NLRB,* 418 F.2d 1208 (D.C.Cir.1969), on the supposition that "[t]he Supreme Court's approach to Section 8(a)(1) and (3) is presently in a state of flux," we suggested that "employer conduct which is 'inherently destructive' of employee rights is an unfair labor practice whether or not such conduct was based upon important business considerations." 418 F.2d at 1209, 1211. We suggested that the balancing of business justifications against the invasion of employee rights would come into play if, and only if, the employer's conduct were found to have a comparatively slight impact on protected employee rights. *Id.* at 1211.

As to the first point, however, the Supreme Court has recently reaffirmed that a finding that an employer's conduct is inherently destructive "does not conclude the inquiry." *Metropolitan Edison Co. v. NLRB,* 460 U.S. 693, 703, 103 S.Ct. 1467, 1474, 75 L.Ed.2d 387 (1983). Rather, the Board must then " 'strike the proper balance between the asserted business justifications and

the invasion of employee rights' " in order to determine whether the employer has committed an unfair labor practice. *Id.* (quoting *Great Dane,* 388 U.S. at 33–34, 87 S.Ct. at 1797–1798). We are not aware of any case, however, in which either the Board or a court has found an employer's action to be inherently destructive of employee rights, and then, after balancing the interests at stake, has nevertheless found the conduct to be lawful under the Labor Act.

As to the second point, the Court stated that if the employer's conduct has a comparatively slight impact, and if it serves "a substantial and legitimate business end," then it is "prima facie lawful." *Great Dane,* 388 U.S. at 34, 87 S.Ct. at 1798 (quoting *Brown,* 380 U.S. at 289, 85 S.Ct. at 987.) In such a case, in order to prove an unfair labor practice, "an affirmative showing of improper motivation must be made." *Id.* It thus appears that a finding of comparatively slight harm calls for a threshold test of business justification, rather than a balancing of interests.

ently destructive of protected employee rights.

In *Erie Resistor*, the Court emphasized that super-seniority, "by its very terms operates to discriminate between strikers and non-strikers, both during and after a strike, and its destructive impact upon the strike and union activity cannot be doubted." 373 U.S. at 231, 83 S.Ct. at 1147. Indeed, the Board had found that

> Super-seniority renders future bargaining difficult, if not impossible, for the collective bargaining representative. Unlike the [right of an employer to hire permanent replacements for striking workers, which the Supreme Court upheld in *NLRB v. Mackay Radio & Telegraph Co.*, 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938), and] which ceases to be an issue once the strike is over, the plan here creates a cleavage in the plant continuing long after the strike is ended. Employees are henceforth divided into two camps: those who stayed with the union and those who returned before the end of the strike and thereby gained extra seniority. This breach is re-emphasized with each subsequent layoff and stands as an ever-present reminder of the dangers connected with striking and with union activities in general.

*Id.*

While the Court's reference to the impact of super-seniority on the particular strike against which it was directed could be read to give a broad sweep to the concept of activity that is "inherently destructive" of employee rights, the Court has not so understood its meaning. Rather, as one widely-quoted comment has suggested, whether employer conduct is inherently destructive hinges on the "distinction between conduct which merely influences the outcome of a particular dispute and that which is potentially disruptive of the opportunity for future employee organization and concerted activity." Note, *Lockouts— Employer's Lockout with Temporary Replacements is an Unfair Labor Practice*, 85 Harv.L.Rev. 680, 686 (1972). The Court made the point itself in *American Ship Building*, when it said:

Proper analysis of the problem demands that the simple intention to support the employer's bargaining position as to compensation and the like be distinguished from a hostility to the process of collective bargaining which could suffice to render a lockout unlawful.

380 U.S. at 309, 85 S.Ct. at 962–963. As restated by the Eighth Circuit, inherently destructive conduct is "that which creates visible and continuing obstacles to the future exercise of employee rights," *Inter–Collegiate Press*, 486 F.2d at 845 (citing Note, *supra*, at 686); or as the Ninth Circuit has put it, such conduct has "far reaching effects which would hinder future bargaining." *Portland Willamette Co. v. NLRB*, 534 F.2d 1331, 1334 (9th Cir.1976).

Essential to understanding the Supreme Court's analysis, we believe, is its distinction between *substance* and *process* in collective bargaining. The Labor Act is process-oriented. It establishes and protects the employees' right to bargain, not their right to *a* bargain. Thus, the employer must negotiate, but it need not agree. Employer "hostility to the process of collective bargaining" is intolerable in this regime, and constitutes a rejection of all that the law requires an employer to accept. Employer hostility to the terms sought by the employees, on the other hand, is to be expected, and is, in any event, the employer's right. Contention, combativeness, and conflict are inconsistent neither with good faith collective bargaining, nor with the employer's other obligations under the Labor Act.

The first question raised by the present case, therefore, is whether an employer's hiring temporary replacements for the employees it has locked out is inherently destructive of the process of collective bargaining or, rather, has only some lesser, or perhaps no, effect on that process. It is clear to us that such employer conduct has little if any impact on the *process* of collective bargaining, and thus does not bear the heavy (if not impossible, *see supra* note 2) burden of justification required of conduct that is inherently destructive of employee rights.

First, there is no reason in principle to expect that hiring temporary replacements for locked out employees will create within the latter group any cleavage that would endure after they return to work, and by dividing the employees, undermine their ability to act in concert to exercise their Section 7 rights. All employees are treated alike both during and after the conflict. Certainly, on the record before us, there is no indication that the Company's conduct in this case left any sort of division at the Portsmouth plant, or any other "visible and continuing obstacles" that will make collective bargaining or any other concerted activity difficult, much less impossible, for the employees in the future; and tellingly, the Union has suggested none. That the employer may have used an effective economic weapon in collective bargaining does not mean that the bargaining *process* is impaired. Indeed, the Union, which has shown itself to be a capable and willing economic warrior in the past, maintained the support of the workers throughout the lockout, and has apparently continued to represent them.

Second, there is nothing about hiring temporary replacements for locked out employees that discourages collective bargaining in the sense of making it seem a futile exercise in the eyes of employees. *Cf. National Metalcrafters v. McNeil*, 784 F.2d 817, 827 (7th Cir.1986); *Robbins Door & Sash Co.*, 260 N.L.R.B. 659, 662 (1982). Of course, to the extent that this tactic, or any other, strengthens the employer's bargaining position, and correspondingly weakens the union's, the employees' return on their investment in concerted activity is diminished. But they are not guaranteed by law that collective bargaining will avail them; the only guarantee is that when they go to the bargaining table, with such strength as they can bring to it, the employer, with such strengths as it has, will be obliged to meet them there, and to bargain with them in good faith.

### 2. *Brown* Indistinguishable on Any Cognizable Ground

The conclusion that the Company's conduct in this case was not inherently de-structive of employee rights also appears to be compelled by the Supreme Court's reasoning in *American Ship Building* and *Brown*. Under *American Ship Building*, it is clear beyond cavil that the bargaining lockout in this case, standing alone, is not inherently destructive of employee rights. Under *Brown*, we do not believe that by continuing to operate with temporary employees, the Company transformed a lawful form of economic pressure into a tactic that was inherently destructive of protected employee rights.

As we discussed above, prior to *Brown* the Court had held in *Truck Drivers Union* that a nonstruck employer that was a member of a multiemployer bargaining unit could lawfully lock out its employees in response to a whipsaw strike against another member. The issue in *Brown* was whether it was a violation of sections 8(a)(1) and (3) for an employer in that same position to continue to operate with temporary replacements during the lockout. The Court rejected the proposition that hiring temporaries was inherently destructive of employee rights. 380 U.S. at 284, 85 S.Ct. at 984 ("[W]e do not see how the continued operations of respondents and their use of temporary replacements imply hostile motivation any more than the lockout itself; nor do we see how they are inherently more destructive of employee rights."). Although it acknowledged that, by continuing to operate during the lockout, the employer increased the economic pressures on its locked-out employees, the Court observed that these pressures are "no different from those that result from the legitimate use of any economic weapon by an employer." *Id.* at 286, 85 S.Ct. at 985. Therefore, the court reasoned, the use of temporary replacement workers during the lockout was not inherently destructive of the employees' right to strike, even though it meant the failure of the whipsaw strike strategy. We see no feature of the employer's conduct in this case that distinguishes it, with regard to the right to strike, from the conduct at issue in *Brown*.

The Court in *Brown* also rejected the claim that the employer's conduct was in-

herently destructive of other employee rights. Inasmuch as the lockout itself was bound to create some discontent among the members of the locked-out union, the Court concluded that "the added dissatisfaction, with its resultant pressure on membership, attributable to the fact that the nonstruck employers remain in business with temporary replacements is comparatively insubstantial." *Id.* at 288, 85 S.Ct. at 986. It discussed three factors that supported this conclusion, each of which is equally applicable in this case. First, because the replacements were to be kept only for the duration of the labor dispute, the locked-out employees were not faced with the threat of losing their jobs. That is also true in this case. Second, by accepting the employers' terms, the employees could put an end to the lockout and return to work at any time. Again, equally true in this case. And third, because the employer did not seek to alter the union shop provision in the previous collective bargaining agreement, the union members "would have nothing to gain, and much to lose, by quitting the union." *Id.* at 289, 85 S.Ct. at 987. Also true in this case. Under these circumstances, the Court in *Brown* held, the employers' conduct had a "comparatively slight," rather than an "inherently destructive," adverse impact on employee rights; and under the same circumstances in our case, we must reach the same conclusion.

The Union contends that *Brown* is inapplicable because the employers in *Brown* acted "defensively" to preserve the integrity of the multiemployer bargaining unit in the face of a whipsaw strike, whereas in this case the Company used the tactic "offensively" to increase its bargaining power. In *Brown,* however, the Court's conclusion that the employers had acted to maintain the multiemployer bargaining group was independent of its analysis of whether their actions had been inherently destructive of their employees' rights. Rather, preserving the bargaining unit was, in the language of *Great Dane,* the "legitimate and substantial business justification" that the Court sought and found quite apart from its determination that the employers' actions were not inherently destructive of

protected employee rights. The *Brown* court clearly stated first that "here, the tendency to discourage union membership is comparatively slight," *id* at 287, 85 S.Ct. at 986, and separately that "the respondents' attempt to remain open for business with the help of temporary replacements was a measure reasonably adapted to the achievement of a legitimate end—preserving the integrity of the multiemployer bargaining unit." *Id.* at 289, 85 S.Ct. at 987. As we discuss below, moreover, the purported distinction between "offensive" and "defensive" tactics simply cannot withstand scrutiny.

Therefore, on the question whether the lockout and hiring of temporary replacements was inherently destructive of employee rights, this case is indistinguishable from *Brown;* it is irrelevant that here there was no whipsaw strike. In this case, then, we simply repeat what the Supreme Court said in *Brown:* "[W]e do not see how the continued operations of [employers] and their use of temporary replacements imply hostile motivation any more than the lockout itself; nor do we see how they are inherently more destructive of employee rights." *Id.* at 284, 85 S.Ct. at 984.

We also note that the use of temporary replacements, unlike the initial lockout, does not itself deprive employees of work or otherwise impose a cost upon them. Rather, if it works, it only strengthens the employer's bargaining power by decreasing the cost to it of resisting the employees' demands or of insisting upon its own. It is clear, however, that any effect on the parties' relative bargaining power—so long as it does not substantially impair the employees' ability to organize and to engage in concerted activity—is simply outside the scope of proper inquiry under sections 8(a)(1) and (3). The Supreme Court, in a long line of cases, has repeatedly emphasized that it is not the role of the NLRB, and certainly not that of the courts, to regulate the bargaining power of the parties to a labor dispute. Thus, in *American Ship Building,* the Court acknowledged that a lockout "may well dissuade employees from adhering to the position which

they initially adopted in the bargaining," but stated that "the right to bargain collectively does not entail any 'right' to insist on one's position free from economic disadvantage." 380 U.S. at 309, 85 S.Ct. at 962. The employees might suffer an "economic disadvantage" because of the lockout, it noted, but "the existence of an arguable possibility that someone may feel himself discouraged in his union membership" as a result of an action that his employer may take during a bargaining dispute does not by itself make that action inherently destructive of employee rights. *Id.* at 312–13, 85 S.Ct. at 964–65.

■ Indeed, the Court criticized the NLRB for having, "in essence, denied the use of the bargaining lockout to the employer because of its conviction that use of this device would give the employer 'too much power.'" *Id.* at 317, 85 S.Ct. at 967. This approach, the Court chided, is "fundamentally inconsistent with the structure of the [Labor] Act," *id.* at 318, 85 S.Ct. at 967, reaffirming that "Sections 8(a)(1) and (3) do not give the Board a general authority to assess the relative economic power of the adversaries in the bargaining process and to deny weapons to one party or the other because of its assessment of that party's bargaining power." *Id* at 317, 85 S.Ct. at 966–967. Thus, even if an employer's bargaining power is greater because it can temporarily replace locked-out employees—and at least in cases where doing so would be practical, it most probably is—that consequence can have no bearing on the lawfulness of the employer's doing so.

Despite the reasoning of *Brown* and *American Ship Building*, the Union relies on the decision of the Seventh Circuit in *Inland Trucking*, 440 F.2d at 562, to support its contention that the lockout and hiring of temporary replacements is an unfair labor practice. In that case, the court held that a "bargaining lockout," although not in itself inherently destructive of employee rights, "does become so if the employer does not shut down, but continues operation with temporary replacements." *Id.* at 564. The court explained that

[such a tactic] would not merely pit the employer's ability to withstand a shut down of its business against the employees' ability to endure cessation of their jobs, but would permit the employer to impose on his employees the pressure of being out of work while obtaining for himself the returns of continued operation.... Permitting an employer to impose this additional price on the protected right to collective bargaining would, in our opinion, conflict with the intended scope and content of that right, as protected in 29 U.S.C. § 157.

*Id.* In the Seventh Circuit's view, then, it is a proper contest of economic strength if the employer is required to shut down its business during the lockout; but if the employer tries to "obtain[ ] for himself the returns of continued operation" during the lockout, thereby placing additional economic pressure on the employees, then the contest becomes impermissible under the Labor Act. Although that court expressly disavowed any intention of regulating the parties' relative bargaining power, *id.*, its approach appears to us to do just that; and that seems fundamentally inconsistent with the Supreme Court's repeated insistence that neither the Board nor the courts may "introduce some standard of properly 'balanced' bargaining power, or some new distinction of justifiable and unjustifiable, proper and 'abusive' economic weapons into [the Labor Act]." *American Ship Building*, 380 U.S. at 317, 85 S.Ct. at 967 (quoting *NLRB v. Insurance Agents' International Union*, 361 U.S. 477, 497, 80 S.Ct. 419, 431, 4 L.Ed.2d 454 (1960)). Therefore, we are constrained to reject both the reasoning and the conclusion of *Inland Trucking*.

The Union also argues that it is inherently destructive of employee rights for an employer to lockout and temporarily to replace its employees, because, as a practical matter, "the odious result" is "capitulation rather than bargaining." This contention is plainly incorrect, however. First, there is no general reason to believe that allowing employers to hire temporary replacements for locked-out workers will inevitably lead to employee capitulation in bar-

gaining. Locked-out employees may find temporary (or even permanent) employment elsewhere, and may receive strike benefits (and, in some states, unemployment insurance), thereby enhancing their ability to hold out for a better bargain. On the other side of the conflict, although it is possible, it is quite unlikely that an employer will fare well using temporary replacements during a lockout. Any business that requires skilled, or just experienced, workers will operate less efficiently when even some of them, much less all, are suddenly replaced. Nor is there any guarantee that there will be a supply of workers willing to accept temporary jobs at the wages an employer will be willing to pay for replacements. And, of course, locked-out employees can picket to dissuade such available workers as there may be. Therefore, we simply cannot agree that employees, who have available to them a full arsenal of economic weapons, will inevitably be forced to capitulate to any employer that has temporarily replaced them.

Second, the record in this case demonstrates the opposite of the Union's claim: hiring temporary replacements did not enable the employer to demand an unconditional surrender by its locked-out employees.[3] Even if the Union had been forced to capitulate, moreover, we would not be free to disregard the Supreme Court's persistent admonition that the Labor Act does not prohibit use of an economic weapon simply because it appears to be "too powerful." Unless the weapon is inherently destructive of the process rights secured to employees by law, and is not justified by compelling business interests, the Board is not free to order the employer unilaterally to disarm.

### B. *The Business Justification*

We accept the NLRB's position that, although not inherently destructive, the Company's conduct in this case "could have adversely affected employee rights to *some* extent," *Great Dane*, 388 U.S. at 34, 87 S.Ct. at 1798, and that it should therefore be treated as having a "comparatively slight" impact on employee rights. Accordingly, our task is not yet over; in view of *American Ship Building*, however, what remains is quite simple.

In order to avoid liability under sections 8(a)(1) and (3), an employer whose conduct has a comparatively slight adverse effect on the rights of its employees must still come forward with a "legitimate and substantial business justification[ ]" for its actions. *Id.* In this case, the Board found, and the Union does not dispute, that the Company's sole purpose in locking out its employees and continuing to operate was to secure a new collective bargaining agreement on favorable terms. As the Board found in *Harter*, because the employer's ability to maintain a lockout is enhanced when it continues to operate, the use of replacement workers "serves precisely the same purpose served by the lockout, i.e., bringing economic pressure to bear in support of a legitimate bargaining position." 280 N.L.R.B. No. 71 at 8.

This purpose, this business justification, is, as the Board correctly noted, "unassailable" in light of *American Ship Building*. In that case, the Court expressly stated that, if the employer's conduct is not inher-

---

**3.** When the Company decided to hire temporary replacements, the Union was demanding two successive wage increases of $.495 per hour, and the Company had offered successive raises of $.32 per hour. When they settled, after temporary workers had been employed for more than two months, they agreed to consecutive increases of $.35 per hour. While this figure is much closer to the Company's offer than to the Union's demand, the Union acknowledges that the two most contentious issues in bargaining were the *management rights clause and the insurance cost containment clause.* On the former, it was the Company, not the Union, that "capitulated" in the end. On the latter, they compromised, agreeing to a clause that permitted the Company to switch to a less expensive health plan but required it to cover any increases in premiums during the term of the collective bargaining agreement. As a whole, then, this seems to have been a bargained result, not one imposed by a victor upon a vanquished adversary.

Similarly, in *Harter*, the employer locked out its employees and continued to operate in order to gain union acceptance of a new contract that provided for substantial wage and benefit reductions. In the end, however, the employer actually agreed to wage increases in each year of the contract.

ently destructive of employee rights, and if it is not motivated by antiunion animus, then there is no violation of the Labor Act when the employer's purpose is "merely to bring about a settlement of a labor dispute on favorable terms." 380 U.S. at 313, 85 S.Ct. at 965. At the conclusion of that opinion, the Court again indicated that "bringing economic pressure to bear in support of [a] legitimate bargaining position" is a business justification sufficient to support an employer action that does not have an inherently destructive impact on employee rights. *Id.* at 318, 85 S.Ct. at 967.

To be sure, the employer in *American Ship Building* did not choose to continue its operations during the lock-out. But as the Board argues to us, "[t]hat an employer chooses to apply additional pressure by continuing to operate its business ... does not render invalid or insubstantial its otherwise substantial and legitimate business justification." Therefore, we find that the Company's conduct in this case was supported by a legitimate and substantial business justification within the meaning of *Great Dane.*

This conclusion, we believe, is buttressed by the Court's decision in *Brown.* In that case, as we mentioned above, the stated justification was to "preserve the integrity" of the multiemployer bargaining group. But as NLRB Chairman Miller cogently observed in *Inter–Collegiate Press,* 199 N.L.R.B. 177, 179 (1972) (concurring opinion), the employers' "defensive" business justification in *Brown* was really no different from the employer's "offensive" business justification in *American Ship Building:* "[T]he legitimate interest of the employer in [*Brown*] was not the preservation of some ultimate social good, but purely and simply was the interest in maintaining, along with other relatively small employers, the added economic muscle supplied by their joint action." Thus, in entering into a multiemployer group, the employers' motive was simply to strengthen their bargaining position; certainly, then, their "sole purpose" in trying to "preserve the integrity" of that group was, at bottom, to bring greater economic pressure to bear in support of their bargaining position.

In fact, we believe that, upon examination, the distinction between "offensive" and "defensive" tactics is ultimately unavailing. The Supreme Court has never adopted it, even when it reviewed Board decisions couched in those terms. *See, e.g., The American Ship Building Co.,* 142 N.L.R.B. 1362, 1364 (1963), *rev'd,* 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965). As Professor Meltzer has observed, moreover, whatever the label affixed to a particular case, "the fact remains that the defensive [tactic] has its primary significance as an attempt to improve the employer's bargain." Meltzer, *Lockouts Under the LMRA: New Shadows on an Old Terrain,* 28 U.Chi.L.Rev. 614, 621 (1961). It is also difficult, if not impossible, as an administrative matter to discern whether an employer acts "offensively" to exercise bargaining power, or "defensively" to deflect the exercise of bargaining power against it. *See* Meltzer, *The Lockout Cases,* 1965 Sup. Ct.Rev. 87, 101. The particular objectives are but branches of the same tree, united by the employer's single root purpose of securing for itself the best possible bargain. Given the inherent artificiality of trying to separate these objectives, it would be unfortunate to make substantial consequences, such as liability under the Labor Act, turn on the labels "offensive" and "defensive."

Finally, in concluding that the use of temporary replacements during an otherwise lawful lockout is not a violation of the Labor Act, we are not unmindful of the principle of *NLRB v. Mackay Radio & Telegraph Co.,* 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938). In that case, the court stated for the first time that it is not an unfair labor practice for an employer to replace striking workers with permanent replacements in order to continue its business operations. As a practical matter, it seems generally desirable to attach the same legal consequences to the use of replacements after an impasse in bargaining, regardless of whether it follows a lawful lockout or an economic strike. If the ability to use replacements depends upon

whether there has been a strike or a lockout, then

an employer convinced of the inevitability of a test of strength may seek to provoke a strike in order to preserve his option legally to employ replacements. Such tactics might poison the atmosphere more than a candid resort to a lockout and might also create bargaining gaps that might otherwise be avoided in the bargaining process.

Meltzer, *The Lockout Cases, supra* p. 767, at 104–105. Of course, by proscribing bad faith bargaining, the Labor Act limits the lengths to which an employer may go in order to provoke a strike; but there is no reason to create an incentive for an employer artfully to precipitate a strike in order to achieve what it cannot achieve with a lockout.

We do not mean to suggest that a lockout followed by *permanent* replacements would necessarily be a lawful tactic under the Labor Act; we express no opinion on that question, as it is not before us today, except to note that it raises somewhat different concerns than those suggested by a *strike* with permanent replacements. Although it may be possible for an employer to provoke a strike in a particular case, it is still the employees who must decide whether to resort to that tactic. If the labor market is such that an employer might be able to find permanent replacements, then employees may choose not to strike, no matter what the provocation. The decision to lock out, on the other hand, is entirely in the hands of the employer. Therefore, as Professor Meltzer has noted, a "lockout, followed by permanent replacements, might too easily become a device for union busting, successfully disguised as an effort to protect the employer's bargaining position and his legitimate interest in maintaining operations." Meltzer, *The Lockout Cases, supra* p. 767, at 104.

## IV. CONCLUSION

We hold that sections 8(a)(1) and (3) of the Labor Act, as the Supreme Court has analyzed them, compel the conclusion reached by the NLRB in this case: an employer may, for the sole purpose of strengthening its bargaining position, continue to operate its business with temporary workers after lawfully locking out its permanent employees. That tactic is not inherently destructive of protected employee rights; to the extent that it has any impact on those rights, the use of economic pressure in order to obtain favorable contract terms is a legitimate, substantial, and sufficient business justification for it. Therefore, the petition for review is

DENIED.