864 F.2d 1096
 130 L.R.R.M. (BNA) 2201, 110 Lab.Cas. P 10,886
 DISTRICT 1199P, NATIONAL UNION OF HOSPITAL AND HEALTH CARE
EMPLOYEES, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Morton Development Corporation, Intervenor.
 No. 88-3141.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 15, 1988.
Decided Jan. 4, 1989.
 
 David M. Silberman (argued), Laurence Gold, Washington, D.C., Miriam L. Gafni, Freedman and Lorry, P.C., Philadelphia, Pa., for petitioner.
 Peter Winkler (argued), Michael D. Fox, Aileen A. Armstrong, Rosemary M. Collyer, John E. Higgins, Jr., Robert E. Allen, N.L.R.B., Washington, D.C., for respondent.
 Lawrence B. Fine (argued), Julia W. Manning, Morgan, Lewis & Bockius, Philadelphia, Pa., for intervenor.
 Before BECKER, HUTCHINSON and SCIRICA, Circuit Judges.
 OPINION OF THE COURT
 BECKER, Circuit Judge:
 
 I. INTRODUCTION
 
 1
 As briefed and argued, this petition by District 1199P, National Union of Hospital and Health Care Employees ("Union"), for review of a final order of the National Labor Relations Board presents the important question whether an employer has a duty to bargain with a union when, after a bona fide closing of a facility for economic reasons, the employer reopens the facility as a different operation but employs former workers to perform jobs similar to those they performed while members of the bargaining unit.[1] However, in addressing the petition, this opinion will ultimately focus upon the issue of what deference is due by a reviewing court when the agency has failed to supply a reasoned explanation of its actions.
 
 
 2
 For several years, Morton Development Corporation ("Morton") operated an intermediate care facility for mentally retarded adults at which the Union was the exclusive bargaining agent for service and maintenance employees. In 1983 or 1984, due to adverse business conditions, Morton decided to close the facility with a view to converting it to a nursing home or selling it. The plant was closed in June 1985. However, an agreement to sell the plant to a third party fell through, and in November 1985, Morton reopened the plant as a nursing home and reemployed many members of the original bargaining unit. The Union demanded recognition. When Morton refused, the Union filed an unfair labor practice complaint.
 
 
 3
 Notwithstanding that the employer who opened the nursing home was the same employer who operated the predecessor facility for the mentally retarded at the same plant, and that the reemployed workers were performing similar jobs, the administrative law judge declined to apply the normal presumption of continuation of the bargaining relationship when a business changes character but not ownership. He essentially analyzed the case under the successorship doctrine, which is ordinarily applied only when there has been a change of ownership. He ruled that, in view of the change in operations and the uncontradicted evidence that Morton had acted in good faith in severing the bargaining relationship, it had no obligation to bargain with the Union. However, the ALJ did not confront the overriding question relevant to successorship cases--whether the business had so changed that it would have affected the employees' "legitimate expectations in continued representation." Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 107 S.Ct. 2225, 2236, 96 L.Ed.2d 22 (1987). Nor did the ALJ make clear why, in the absence of a change of ownership, successorship jurisprudence should apply, or, assuming that it may apply, how great the change in the business operation must be in order for an employer to free itself from its obligation to bargain with the union.
 
 
 4
 In a cursory opinion, containing a cryptic footnote, a divided panel of the NLRB adopted the ALJ's recommended order based on the "specific and unique facts of this case." Morton, slip op. at 1 n. 1. The NLRB failed to explain, however, what was "specific and unique" about this case, and did not articulate the rationale of its affirmance.
 
 
 5
 While a court must defer to the NLRB's interpretation of the Act as long as that interpretation is rational and consistent with the Act, the overarching principle of agency review is that the agency must provide a reasoned explanation of its actions. See Local 825, International Union of Operating Engineers v. NLRB, 829 F.2d 458, 460 (3d Cir.1987). Only then is it clear that the agency applied its expertise to the issue and only then can a reviewing court assess the rationality of the agency's interpretation.
 
 
 6
 In view of the failure of the NLRB to state what rule of law it applied in this case, or why, we will grant the petition for review and remand the case so that the NLRB may give it fuller consideration and provide an adequate explanation of its decision.
 
 II. THE FACTS
 
 7
 From November 1979 to June 27, 1985, Morton operated an intermediate care facility for mentally retarded adults in Easton, Pennsylvania. The Commonwealth of Pennsylvania provided all of the facility's revenue. On June 7, 1983, the NLRB certified the Union as the exclusive bargaining agent for about fifty-five of Morton's employees, including living-unit aides, therapeutic recreation aides, transportation aides, occupational therapy aides, diet aides, cooks, maintenance assistants, and housekeeping aides. Members of the bargaining unit performed a variety of services for the facility's mentally retarded residents. For example, living-unit aides, the largest group of employees, helped the residents to master such life skills as bedmaking, dressing, and bathing. Diet aides and cooks helped prepare and serve family-style meals. While the positions had a vocational component, all were service-oriented and low-paying.
 
 
 8
 In March 1984, Morton, doing business as Praxis, entered into a one-year collective bargaining agreement with the Union that Morton and the Union later agreed to extend to June 30, 1985. In late 1983 or early 1984, however, Morton decided to cease operations as a facility for the mentally retarded because of economic problems. Morton considered both converting the Easton facility to a nursing home and selling it. In October 1984, Morton began to seek necessary governmental approvals for conversion of the facility to a nursing home.
 
 
 9
 On April 15, 1985, for business reasons that the Union does not contest, Morton entered into an agreement to sell the plant to the Upper Bucks Nursing and Convalescent Center ("Upper Bucks"), a division of Quakertown Hospital. Morton negotiated a termination agreement with the Union that included a severance pay provision and closed the facility on June 27, 1985. Morton rehired a few persons on a short-term contract basis to shut down the plant. On July 2, 1985, Morton notified the Pennsylvania Department of Health of the change in ownership. All parties agree that as of June 1985 neither Morton nor the Union expected Morton to resume any operations at the plant.
 
 
 10
 On August 30, 1985, however, Morton's deal with Upper Bucks collapsed. Unable to find another buyer, Morton reopened the plant on November 6, 1985, under the name "Praxis Nursing Home" as a skilled, privately-funded, nursing home, primarily for elderly patients. In converting the plant from an intermediate care facility for the mentally retarded to a nursing home primarily for the elderly, Morton spent $130,000 on modifications to address the needs of its new patients, such as removing recreational equipment used by the mentally retarded and installing nursing stations and handrails for the elderly.
 
 
 11
 When the nursing home opened on November 6, 1985, its first eleven service and maintenance employees all had been service and maintenance employees of Morton when it had operated the facility for the mentally retarded. Each of the employees, however, had undergone a two-day training period upon being rehired to acquaint them with the difference between working in a facility for the mentally retarded and a nursing home. The two-day training period was followed by ninety days of on-the-job training prior to permanent employment. Morton subsequently rehired additional former employees to work at the nursing home as dietary aides, housekeeping aides, laundry aides, activities aides, nurse's aides, maintenance employees, and cooks, although many eventually left to work elsewhere. Morton rehired many former living-unit aides, the largest employee group at the facility for the mentally retarded, to work as nurse's aides, the largest employee group at the nursing home.
 
 
 12
 On November 15, 1985, the Union demanded that Morton recognize the Union as the bargaining agent for the service and maintenance employees at the nursing home. Morton refused. On November 21, 1985, the Union filed a complaint with the NLRB alleging that Morton's failure to recognize and bargain with the Union constituted an unfair labor practice in contravention of section 8(a)(5) of the Act, 29 U.S.C. Sec. 158(a)(5) (1982) (duty to bargain).
 
 III. THE ADMINISTRATIVE LAW JUDGE'S DECISION
 
 13
 On May 27, 1987, the ALJ held that Morton had not committed an unfair labor practice despite its refusal to bargain. The ALJ decided the case by relying upon the successorship and alter ego doctrines.[2] As he put it:[A]llusion to the Board's successorship and alter ego analysis is justified in order to evaluate whether the business has changed so significantly as to have necessarily altered the relationship between the owner/operator and the former employees, and transformed it to one of new employer and new employee. If a new relationship has arisen from a context of a new employment environment in a substantially different business, then there is no warrant to imply the Union's continuing majority bargaining agent status.
 
 
 14
 Opinion of ALJ, typescript at 13 (citation omitted).
 
 
 15
 Noting that under successorship principles a new owner need not bargain with the old union if there has been a substantial change in the employment relationship, the ALJ focused on employees' attitudes at the time the plant was shut down, on the differences in the employees' jobs after the facility was reopened as a nursing home, and on the fact that the change in operations had been made for legitimate business reasons. He concluded that "Praxis Nursing is a different business that provides a different service to a different kind of client drawn from a different market, and who employed former Praxis employees under a new employment relationship which precluded any continued obligation to recognize the Union as the assumed majority bargaining agent." Id. at 15. However, the ALJ did not explain why successorship analysis was appropriate in a case in which there had been no change of ownership. Nor did he explain why the employees' attitude at the time of the plant closure (as opposed to the time of reopening) was relevant, nor why the changes in the nature of the jobs would have affected the employees' attitude toward union representation.
 
 IV. THE NLRB'S DECISION
 
 16
 On December 16, 1987, in an extremely brief opinion, a divided panel of the NLRB affirmed the recommended order of the ALJ. The text of the opinion merely stated that the Board had decided to "affirm the [ALJ's] rulings, findings, and conclusions and to adopt the recommended Order." Morton, slip op. at 1 (footnote omitted). However, in a footnote to the word "affirm," the majority briefly summarized the facts of the case, noting in particular Morton's good faith in dealing with the Union and Morton's change in operations. The Board concluded in the footnote that "[u]nder the specific and unique facts of this case, we agree with the [ALJ's] conclusion." Id. at 2 n. 1.[3]
 
 
 17
 One member of the Board dissented. She believed that the changes in operation had not substantially affected the employer-employee relationship or the employees' expectations of continued union representation. Regarding the change in operations, the dissenting member opined that the skills and qualifications required of the service and maintenance employees had changed little, despite the metamorphosis from a facility for the mentally retarded to a nursing home. Regarding the employees' continued expectations of union representation, the dissenting member referred to the Supreme Court's recent decision in Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987). See Morton, slip op. at 3-5 (Cracraft, Member, dissenting). Fall River Dyeing held that a key focus in the successorship context was the "legitimate expectations" of the employees in continued union representation. 107 S.Ct. at 2236. The dissenting member did not, however, indicate whether the successorship doctrine provided the rule in this case, see Morton, slip op. at 5 & n. 4, or whether an "allusion" to the successorship was, as the ALJ claimed, justified.
 
 
 18
 V. SCOPE OF REVIEW, AND THE IMPORTANCE OF THE NLRB'S
 
 
 19
 REASONED EXPLANATION AND CLEAR ARTICULATION OF ITS DECISION
 
 
 20
 Our authority to review an order of the NLRB is limited. "If the Board adopts a rule that is rational and consistent with the Act, then the rule is entitled to deference from the courts. Moreover, if the Board's application of such a rational rule is supported by substantial evidence on the record, courts should enforce the Board's order." Fall River Dyeing, 107 S.Ct. at 2235 (citations omitted). On the other hand, "the deference owed to an agency construction of a statute depends substantially on the persuasiveness of the agency view. A position without reasoning has little power to persuade." Local 825, International Union of Operating Engineers v. NLRB, 829 F.2d 458, 460 (3d Cir.1987) (citation omitted). "[T]he Board bears the burden of stating reasons for its action and making sufficient factual findings to support them. Only when the Board does so can it clearly show that it has legitimately exercised its discretion." Local 467, Upholsterers' International Union v. NLRB, 419 F.2d 179, 182 (3d Cir.1969).
 
 
 21
 The Union contends that the NLRB's order does not provide a reasoned explanation for the NLRB's conclusion. It claims that the NLRB's opinion is subject to two interpretations--either the NLRB adopted the ALJ's opinion in its entirety as stated in the text of the order, or, as the language of the footnote indicates, the Board adopted only the order and not the ALJ's opinion. We have stated that we will not refuse to enforce an order of the NLRB "merely because the [NLRB] adopted the ALJ's findings and conclusions with respect to such order instead of filing independent findings." NLRB v. Daybreak Lodge Nursing & Convalescent Home, Inc., 585 F.2d 79, 81 (3d Cir.1978). But the Union does not request that we require the NLRB to file independent findings in this case. Instead, it points out that in this case it is impossible to determine what findings and conclusions the NLRB either adopted or made independently.
 
 
 22
 We turn to an analysis of the union's contentions in light of the applicable law.
 
 VI. DISCUSSION
 
 23
 A. The Status of the Union as the Employees' Representative
 
 
 24
 A union chosen by an appropriate bargaining unit is presumed to have the continued support of the majority of its members. See Fall River Dyeing, 107 S.Ct. at 2233; NLRB v. Burns International Security Service, Inc., 406 U.S. 272, 279 n. 3, 92 S.Ct. 1571, 1578 n. 3, 32 L.Ed.2d 61 (1972). The purpose behind this presumption is to promote stability in the collective-bargaining relationship and hence industrial peace. See Fall River Dyeing, 107 S.Ct. at 2233. "Where an employer remains the same, a Board certification carries with it an almost conclusive presumption that the majority representative status of the union continues for a reasonable time, usually a year. After this period, there is a rebuttable presumption of majority representation." Burns, 406 U.S. at 279 n. 3, 92 S.Ct. at 1578 n. 3 (citations omitted). After the initial year, the question whether the presumption of continued majority support has been rebutted is recast in terms of whether the employer "has reasonable, good faith grounds for believing that the union has lost its majority status" after a collective bargaining agreement has expired. International Association of Bridge, Structural & Ornamental Iron Workers, Local 3 v. NLRB, 843 F.2d 770, 772 (3d Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 222, 102 L.Ed.2d 213 (1988).
 
 
 25
 In order to show good faith doubt, the employer must produce evidence probative of a change in employee sentiment. This is a difficult burden to meet. For example, the fact that an employee has crossed a picket line is not evidence that the employee has abandoned his union. NLRB v. Frick, Co., 423 F.2d 1327, 1333-34 (3d Cir.1970). Similarly, we have declined to accept testimony proffered by an employer's representative based on his subjective conclusions about change in sentiment. Toltec Metals, Inc. v. NLRB, 490 F.2d 1122, 1125 (3d Cir.1974). Even a petition circulated by employees may not lend credence to an employer's good faith doubt. Garrett R.R. Car & Equipment, Inc. v. NLRB, 683 F.2d 731, 737 (3d Cir.1982). In sum, for an employer "[t]o meet this burden 'requires more than an employer's mere mention of [its good faith doubt] and more than proof of the employer's subjective frame of mind.' What is required is a 'rational basis in fact.' " Toltec, 490 F.2d at 1125 (bracketed statement in original) (quoting NLRB v. Rish Equipment Co., 407 F.2d 1098, 1101 (4th Cir.1969)); see also Frick, 423 F.2d at 1331.
 
 
 26
 The NLRB does not purport to apply the presumption of majority support in this case. In the absence of any explanation from the NLRB beyond its cryptic comment that the facts are "specific and unique," we cannot tell why in this case the NLRB ignored the Burns presumption of majority rule at Morton's plant. Morton, after all, was the employer both at the facility for the mentally retarded and the nursing home. Although some of the facts enumerated in the first footnote of the NLRB's opinion--such as the amount of time which the plant was closed and the change in operations--could bear on the question of whether the Union was entitled to the presumption of continued majority support, the Board does not explain why these facts are relevant to the employees' attitudes toward the Union in this case. And other facts contained in the Board's footnote--such as Morton's good faith in closing and reopening the facility--appear to have nothing to do with the presumption.
 
 
 27
 If the NLRB is holding that a single employer is not bound by the presumption of majority support when it significantly changes it operations, or when it closes its plant without expectation of reopening and then reopens a significantly changed operation, or for some other reason, it must state the rule explicitly. And it must provide its reason for adopting that interpretation of the law. A reviewing court cannot properly judge the NLRB's action without knowing what the NLRB did and why.
 
 B. The Successorship Doctrine
 
 28
 We are also troubled that the NLRB did not make clear whether it was applying successorship doctrine to this case and, if so, how it was to be applied, and what the justification was for applying it in a case in which there was no change of ownership. Under successorship doctrine, a new employer who takes over an ongoing business can be free of obligations to bargain with the union that represented its predecessor's employees if there has not been "substantial continuity between the enterprises." Fall River Dyeing, 107 S.Ct. at 2236.
 
 
 29
 The ALJ, in his opinion, drew upon successorship principles in determining whether Morton was obligated to continue to bargain with the Union. The NLRB, in the text of its opinion, purported to affirm the ALJ's opinion in full. Slip op. at 1. However, the footnote to its opinion which refers to the "specific and unique" facts of the case, seems to indicate a less than wholehearted adoption of the ALJ's approach. Furthermore, in its brief to this court, the Board asserted that successorship doctrine was "inapposite" to the case at bar, but it failed to articulate what general principle had been applied. Given this incoherence, it is impossible for us to say with any certainty what it is the Board did, and thus it is impossible for us to assess the validity of the Board's approach.[4]
 
 
 30
 Moreover, if the NLRB is applying successorship principles to the case at bar, it has not given a reason for this approach. The expansion of the doctrine of successorship to allow a single employer who changes its operations to be free of bargaining obligations could have a significant effect on the relationship between employers and unions. It could undermine the goal of stability and industrial peace which the continuing obligation to bargain fosters. See Fall River Dyeing, 107 S.Ct. at 2233. The Supreme Court noted that this doctrine of successorship safeguards the "rightful prerogative" of new owners to independently arrange their businesses without being unduly bound by the actions of their predecessors. Id. at 2234. This principle does not appear to apply, however, when there has been no change of ownership. Where the NLRB applies a doctrine in a radically new way, it is its responsibility to justify its conclusion.[5]
 
 
 31
 Finally, we note that to the extent that the ALJ was applying successorship principles, he applied them incorrectly. In the first place, the ALJ relied on the fact that Morton's employees had no expectation of being rehired by Morton when Morton closed the facility for the mentally retarded. In Fall River Dyeing, the Supreme Court addressed the issue of when employees' expectations of continued representation are relevant to successorship analysis, as follows:
 
 
 32
 If the employees find themselves in a new enterprise that substantially resembles the old, but without their chosen bargaining representative, they may well feel that their choice of a union is subject to the vagaries of an enterprise's transformation.
 
 
 33
 Fall River Dyeing, 107 S.Ct. at 2234. We interpret this statement as indicating that employees' expectations of continued representation should be judged at the time they are rehired, rather than at the time that the old enterprise was terminated.
 
 
 34
 Second, it is not enough for the ALJ or the NLRB merely to describe changes in the business and then declare that the bargaining obligation has been terminated. Instead, the Board must assess whether there was an "essential change in the business that would have affected employee attitudes towards representation." Premium Foods, Inc. v. NLRB, 709 F.2d 623, 627 (9th Cir.1983); accord Spencer Foods, 768 F.2d at 1470 (requiring the NLRB to state why the changes it identified would affect employee attitudes toward representation). As the Supreme Court has noted, the key question in applying successorship doctrine is whether from the employees' perspective their new jobs were so similar that the employees would have "legitimate expectations in continued representation by their union." Fall River Dyeing, 107 S.Ct. at 2236.
 
 
 35
 In this case, the ALJ did not state how the changes he noted would have affected the employees' expectations of continued representation. In its brief, the Union points out that a number of the employees were doing essentially the same jobs under the new operation as under the old and that the largest number of employees--the nurses' aides--were spending their time feeding and dressing people instead of teaching them how to feed and dress themselves, a distinction, it submits, of no material difference. The ALJ has not explained why such differences in jobs would make a difference to employees with respect to their expectation of union representation.[6] Thus, even if we were to construe the Board's action as applying successorship principles to this case, we would still be unable to affirm the Board, because the doctrine, if applied, was applied incorrectly.
 
 VII. CONCLUSION
 
 36
 In sum, we agree with the Union that the NLRB has not clearly articulated the principle upon which it decided this case nor given a reason why it adopted that principle. Calling the facts of this case "specific and unique" is no substitute for the NLRB's burden of reasoned explanation. This ipse dixit assertion frustrates judicial review by undermining our ability to determine whether the NLRB properly exercised its considerable discretion in the field of labor law. We are simply unable to ascertain what rule the NLRB applied to these "specific and unique" facts, let alone why. In particular, the NLRB failed to explain how Morton overcame the presumption of continued majority support which has traditionally governed the relationship of a continuing employer with a union or why that presumption should not apply. Moreover, it has not made clear whether it was applying successorship principles, and if so, what justified that application. Consequently, we must agree with the Union's contention that the NLRB has rendered a decision "good for this day and train only." Smith v. Allwright, 321 U.S. 649, 669, 64 S.Ct. 757, 768, 88 L.Ed. 987 (1944) (Roberts, J., dissenting). Without knowing what rule of law the NLRB has applied, and its reasons for applying it, we cannot effectively review its decision. We therefore will grant the petition for review and remand this case to the NLRB for further proceedings consistent with this decision.
 
 
 
 [1]
 The NLRB's order is reported at Morton Dev. Corp., 287 N.L.R.B. No. 41 (Dec. 16, 1987). We have jurisdiction pursuant to section 10(f) of the National Labor Relations Act ("Act"), 29 U.S.C. Sec. 160(f) (1982)
 
 
 [2]
 Under the doctrine of successorship, new employers who substantially continue the operations of a previous employer, and whose workforce is comprised of a majority of workers from the former enterprise, must continue to bargain with the pre-existing union. See Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 107 S.Ct. 2225, 2234-35, 96 L.Ed.2d 22 (1987). Under alter ego doctrine, a new employer who is substantially identical to the previous employer is required to continue bargaining with the union and is bound by the substantive terms of its predecessor's agreements with the union. See NLRB v. Scott Printing Corp., 612 F.2d 783, 785-86 (3d Cir.1979)
 
 
 [3]
 Footnote 1 states in its entirety:
 Prior to 27 June 1985 the Respondent, operating under the name Praxis, provided care for mentally retarded adults at its facility in Easton, Pennsylvania. On 7 June 1983 the Charging Party Union was certified as the collective-bargaining representative of the Respondent's service and maintenance employees. Due to monetary losses, the Respondent entered into a sales agreement to sell its facility, and it closed its business on 27 June 1985. It lawfully terminated its employees. The Respondent and the Union engaged in "effects" bargaining and severance pay was paid to those employees for whom alternative employment was not secured.
 Through no fault of the Respondent's, the sales agreement "fell through" in August 1985. Thereafter, the Respondent solicited offers from other prospective buyers but was unsuccessful. Subsequently, rather than absorbing the cost of an idle facility, the Respondent decided to reopen as Praxis Nursing, a geriatric nursing facility. The reopening occurred on 6 November 1985. The Respondent hired some of its former employees. On 15 November 1985 the Union requested recognition as bargaining agent for Praxis Nursing's service and maintenance employees. The Respondent refused to recognize the Union.
 The judge noted that there is no suggestion in this case that the Respondent acted in bad faith. Ultimately, the judge concluded that the Respondent, operating as Praxis Nursing, had changed so significantly from its prior operation as to justify its refusal to recognize the Union. Under the specific and unique facts of this case, we agree with the judge's conclusion.
 Morton, slip op. at 1 n. 1.
 
 
 [4]
 Prior NLRB cases that involve changes by a single employer do not create a clear legal rule that could be applied to this case. The Board has held that an employer cannot unilaterally refuse to bargain with a particular group of employees based on changes in the business, unless the changes demonstrate that the group is no longer an appropriate bargaining unit. See Bay Shipbuilding Corp., 263 N.L.R.B. 1133, 1139 (1982), enforced 721 F.2d 187 (7th Cir.1983); Rice Food Markets, Inc. 255 N.L.R.B. 889 (1981). However, it is not clear that the same analysis should apply when the whole nature of the business has changed
 On the other hand, the NLRB has held that a union is not entitled to an extension of the first bargaining-year's conclusive presumption of majority support, when, for uncontested business reasons, an employer closes a plant, and re-opens it with different employees. See Molded Fiber Glass Body Co., 182 N.L.R.B. 400, 403-04 (1970). However, it is not clear how this decision should affect the case at bar, in which the employees are the same, and the Union is not seeking an extension of the conclusive (as opposed to the rebuttable) presumption of majority status.
 We note that after the instant case was decided, the NLRB did decide a case on similar facts. Sterling Processing Corp., 291 N.L.R.B. No. 30 (Sept. 30, 1988), involved a situation in which a company closed its poultry dressing plant, and reopened the plant more than a year later as an integrated poultry producer and processor. There the Board held that the changes in operation, and the hiatus, did not abrogate the employers duty to bargain, as the employing entity was "the same after the hiatus as it was before." Slip op. at 8. We leave it to the NLRB to consider on remand whether the case sub judice is distinguishable from Sterling Processing.
 
 
 [5]
 Two circuits have considered the question whether successorship analysis applies when there has been a sale of all of a corporation's stock to a new entity, but the corporate entity itself remains in existence. The Court of Appeals for the D.C. Circuit applied successorship principles, while the Court of Appeals for the Fourth Circuit treated the stock purchaser as a continuing employer. Compare United Food & Commercial Workers Int'l Union v. NLRB, 768 F.2d 1463, 1469-74 (D.C.Cir.1985) [Spencer Foods ] with EPE, Inc. v. NLRB, 845 F.2d 483, 487-90 (4th Cir.1988). The EPE court narrowly distinguished Spencer Foods; in Spencer Foods, there had been a substantial change in operations not present in EPE. We find it unnecessary to adopt either of these approaches at this time in light of the facts of this case where apparently there is no evidence of any change in entity or ownership
 
 
 [6]
 Nor is it enough for the ALJ merely to point to the hiatus in operations. A hiatus is "only one factor in the 'substantial continuity' calculus and thus is relevant only when there are other indicia of discontinuity." Fall River Dyeing, 107 S.Ct. at 2237