**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**PHOENIX PIPE & TUBE, L.P., d/b/a Phoenix Pipe Company, a Partnership Composed of 1st P.S.C. Corporation, Blue Pearl Associates, Inc., Red Linden Corporation, Blue Linden Corporation, and Phoenixville Steel Corporation, Respondent,**

**United Steelworkers of America, AFL–CIO–CLC, Intervenor.**

**No. 91–3269.**

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6), Dec. 12, 1991.

Decided Dec. 17, 1991.

Jerry M. Hunter, D. Randall Frye, Aileen A. Armstrong, Charles Donnelly and David Seid, N.L.R.B., Washington, D.C., for petitioner.

Howard R. Flaxman, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for respondent.

Richard J. Brean, United Steelworkers of America, Pittsburgh, Pa., for amicus-petitioner, United Steelworkers of America, AFL–CIO–CLC.

Before SLOVITER, Chief Judge, SCIRICA and ROTH, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Chief Judge.

This case comes before us on a petition of the National Labor Relations Board (Board or NLRB) to enforce a cease and desist order issued by the Board against Phoenix Pipe & Tube, L.P. (PP & T). The United Steelworkers of America (Union), the charging party, has intervened. Under section 10(e) of the National Labor Relations Act (Act), 29 U.S.C. § 160(e), this court has jurisdiction over the Board's enforcement application.

### I.

Phoenix Steel Corporation (Phoenix Steel) produced steel products at a plant in Phoenixville, Pennsylvania from the early 19th century until March 31, 1987. Union Local 2322 represented Phoenix Steel's production and maintenance employees for about forty years preceding Phoenix Steel's shut down of the plant in March of 1987 because of financial difficulties. Following this shut down, Phoenix Steel entered into Chapter 11 bankruptcy proceedings in April.

In November 1987, eight months after the plant's closing, Union representatives learned that Phoenix Steel intended to sell the plant to a group of investors led by Robert Serlin, president of 1st P.S.C. corporation (the general partner in the limited partnership that constitutes PP & T). On December 1, 1987, Union officer, John Vogle, and Union attorney, Lynn Saionz, met with Serlin and his attorney, Peter Gold. Vogle requested recognition for the Union and asked to negotiate a contract. Gold replied that PP & T would recognize the Union if an agreement could be reached.

In late December or early January, the Union received a written contract proposal from Serlin. Gold informed the Union that PP & T hoped to begin operations in six to eight weeks and expected to employ around 80 employees, some 55 of whom would work in the production and maintenance areas. Despite several meetings between representatives of the Union and PP & T, however, the Union and the company were not able to reach an agreement on a contract.

On March 23, 1988, with the approval of the bankruptcy court, PP & T purchased the Phoenixville plant and some surrounding real estate. Thereafter, employees began preparing the furnaces for resumption of operations. On April 26, at a meeting of PP & T and Union representatives, Vogle stated that he was still interested in a contract and asked how the Union could get negotiations "back on track." App. at 53. Gold reiterated PP & T's dissatisfaction with the Union's attitude concerning a contract and said that he would be in touch with the Union later.

On April 29, John Reck, a Union Director, sent a letter to Serlin requesting that PP & T recognize the Union as the "exclusive bargaining representative of production and maintenance employees" at the Phoenixville facility. App. at 274. Reck asserted that "a maojrity [sic] of the present workers are [union workers] who worked at the [Phoenixville] plant under the former owner." App. at 376. On May 16, Gold in a letter responded by stating that PP & T would refuse to recognize the Union and that PP & T "had a good faith doubt as to the majority status of [the Union]." App. at 377–78. Soon thereafter the Union filed unfair labor practice charges against PP & T with the NLRB.

### II.

Based on the foregoing facts, the Board found in affirming the decision of the Ad-

ministrative Law Judge (ALJ) that PP & T had violated Section 8(a)(1) and (5) of the Act, 29 U.S.C. 158(a)(1) and (5)[1] by refusing to bargain with the Union as the exclusive bargaining representative of the employees in an appropriate unit. The Board's order requires PP & T to cease and desist from the unfair labor practices found and from interfering with, restraining or coercing the employees in the exercise of their rights guaranteed by section 7 of the Act, 29 U.S.C. § 157.

### III.

In its appeal PP & T raises two issues. First, it claims that it is not the business successor to Phoenix Steel, and thus is under no obligation to recognize the Union as its employees' bargaining representative. Second, PP & T contends that even if it is the successor to Phoenix Steel, it has not violated the provisions of the Act because it had a reasonable good-faith belief that a majority of its employees did not support the Union.

### IV.

■ In reviewing a NLRB order, this court may only set aside findings of fact if they not supported by substantial evidence. *Systems Management, Inc. v. NLRB*, 901 F.2d 297, 300 (3d Cir.1990). While our review of the Board's application of legal precepts is plenary, *Local 825, International Union of Operating Eng. v. NLRB*, 829 F.2d 458, 460 (3d Cir.1987), we acknowledge the deference owed to the Board's special expertise in interpreting the Act. *Id.*

### V.

#### A.

■ Successor employer status attaches when the following two criteria are met:

(1) a new employer conducts essentially the same business as its predecessor, *Premium Foods, Inc. v. NLRB*, 709 F.2d 623, 627 (9th Cir.1983); and (2) a majority of the workers employed in the new business had been employed by its predecessor. *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 41, 107 S.Ct. 2225, 2234, 96 L.Ed.2d 22 (1987). If these two factors are present, the new employer attains successorship status and is obligated "to bargain with the union representing [its] predecessor's [former] employees." *Id.* at 29, 107 S.Ct. at 2229.

■ The record clearly demonstrates that as of May 16, 1988, the date that PP & T announced its intention not to recognize the Union, a majority of PP & T production and maintenance employees (41 of 54) had been employed at Phoenix Steel. Further, six months later, practically the same percentage of PP & T production and maintenance employees had worked at Phoenix Steel previously (44 of 58). PP & T does not challenge that at all possible relevant times, a majority of PP & T's production and maintenance workers had formerly been employed at Phoenix Steel.

In addition to continuity in the work force, the Board must find continuity of enterprise for it to conclude that PP & T is a successor to Phoenix Pipe. This court in *Systems Management* set out the seven factors used to determine whether a new business is substantially the same as its predecessor. The factors are

1. Whether there has been a substantial continuity of the same business operation;

2. Whether the new employer uses the same plant or equipment;

---

1. This provision states in pertinent part:
   (a) It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
   \* \* \* \* \* \*
   (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

3. Whether the same or substantially the same work force is employed;

4. Whether the same jobs exist under the same working conditions;

5. Whether the same supervisors are employed;

6. Whether the same machinery, equipment and methods of production are used; and

7. Whether the same product is manufactured or the same service is offered.

901 F.2d at 303–04. In applying these criteria, we are mindful that the underlying question is whether "a fundamental change in the *nature* of the business enterprise [has] occur[ed]." *Id.* at 304.

In its brief, PP & T argues that analysis of the seven relevant factors shows that it is not Phoenix Steel's successor. The ALJ analyzed the same factors and concluded that PP & T was Phoenix Steel's successor, a conclusion that the Board adopted. We cannot say that there is not substantial evidence to support this conclusion. While it is true that PP & T's business is not identical to that of Phoenix Steel, it is substantially similar in all respects.

PP & T produces carbon based pipe and tube, essentially the same as that manufactured by Phoenix Steel. About 99 percent of PP & T's production is heavy wall pipe and tube as compared to 75 percent heavy wall production at Phoenix Steel. PP & T sells its products to substantially the same customers as did Phoenix Steel, except for those who purchased light wall and heat treated products (which PP & T does not produce). *See Fall River Dyeing & Finishing,* 482 U.S. at 44, 107 S.Ct. at 2236 (petitioner's abandonment of converting dying, which had accounted for 60–70 percent of predecessor's business, in favor of commission dying did not indicate change in work environment); *Premium Foods,* 709 F.2d at 627 (finding successorship even though 98 percent of new business's sales were to food service area as compared to 60 percent for predecessor). In addition, PP & T's primary manufacturing process and use of machinery is essentially identical to that of Phoenix Steel.

While not identical to that of Phoenix Steel, the management structure of PP & T is very similar. The vast majority of PP & T management personnel held analogous positions while with Phoenix Steel. *See United Food & Commercial Int'l Union v. NLRB,* 768 F.2d 1463, 1473 (D.C.Cir. 1985) (finding successorship despite difference in some management personnel).

As noted above, the vast majority of the PP & T production and maintenance workforce had been employed at Phoenix Steel prior to the plant closing. PP & T, while employing only four job classifications (as compared to 30–35 at Phoenix Steel), utilizes its employees in basically the same positions as did Phoenix Steel. This was done because PP & T determined that it was in its "best interests to put the best operator doing what he knows best." App. at 143. A few production employees perform additional related duties that they did not perform at Phoenix Steel.

PP & T emphasizes that there has been a change in some of the terms of employment, such as the hours in the work week and hourly wage. However, we cannot say these dissimilarities qualify as a fundamental difference between the work environments at Phoenix Steel and PP & T. *See Systems Management,* 901 F.2d at 304 (change from full time to part time employment structure not fundamental).

Although PP & T did not purchase all of Phoenix Steel's capital resources, it did acquire the Phoenixville plant and equipment and related real estate, which encompassed "the specific operations involving the union members." *NLRB v. Cablevision Devel. Co.,* 671 F.2d 737 (2d Cir.1982). Thus as far as our inquiry is concerned, PP & T utilizes all of Phoenix Steel's relevant assets. *See United Food & Commercial Workers Int'l Union,* 768 F.2d at 1472–73 (successorship found even where new business only purchased one of several plants owned by predecessor).

The strongest argument PP & T makes against the Board's finding of successorship centers on the last factor to be considered: whether there has been a substantial continuity in business operation. PP &

T points to the hiatus between the time of Phoenix Steel's shut down of the Phoenixville plant in March of 1987 and PP & T's re-opening of that facility in May of 1988. PP & T contends that this gap in plant operations destroyed the substantial continuity necessary to find successorship.

In *Fall River Dyeing & Finishing*, the Court noted that "a hiatus is only one factor in the 'substantial continuity' calculus and this is only relevant when there are other indicia of discontinuity." 482 U.S. at 45, 107 S.Ct. at 2237. As discussed above, the working conditions at the Phoenixville plant today are very similar to those existing when Phoenix Steel ran the plant. Except for the hiatus, all other factors support a finding of successorship. As such, the hiatus is of minimal relevance here. *See Fall River Dyeing & Finishing*, 482 U.S. at 45, 107 S.Ct. at 2237 (successorship despite seven month hiatus); *United Food and Commercial Workers Int'l Union*, 768 F.2d at 1472 (successorship even with year and a half gap).

In addition, we note that on the eve of the Phoenixville plant closing, Phoenix Steel plant manager, Ronald Anderson, explained to plant employees that while they were "indefinitely" laid off, he was optimistic that someone would purchase the plant. These employees were also aware of Phoenix Steel's efforts to maintain the plant after the shutdown in the hope that someone would buy the plant and operate it as a steel mill. Phoenix Steel employees saw maintenance supervisors and Anderson enter the plant during the period following the shutdown. Employees also continued to attend union meetings in order to keep abreast of any ongoing negotiations to sell the plant.

These facts support the conclusion that the employees had a "legitimate expectation[] in continued representation," *Fall River Dyeing & Finishing*, 482 U.S. at 43, 107 S.Ct. at 2236, and that therefore, "[v]iewed from the employees' perspective, ... the hiatus may have been much less than" the actual thirteen month shutdown. *Id.* at 45, 107 S.Ct. at 2237. Therefore, we conclude that the Board's determination

that PP & T is a successor to Phoenix Steel is supported by substantial evidence.

### B.

Next we address PP & T's contention that it did not violate the Act because it had a reasonable good-faith belief that the Union lacked the support of a majority of the production and maintenance employees. In general, when an employer and a union enter into a collective bargaining agreement, the union's majority status is irrebuttably presumed during the term of that agreement. *NLRB v. Rockwood Energy and Mineral Corp.*, 942 F.2d 169, 173 (3d Cir.1991). Once the collective bargaining agreement expires, the presumption of majority support becomes rebuttable. *Id.* This may be done in either of two ways. The employer may either demonstrate that the union in fact no longer has majority support or establish that it had a reasonable good-faith doubt as to the union's majority support. *Destileria Serrales, Inc. v. NLRB*, 882 F.2d 19, 20 (1st Cir.1989). To rebut the presumption the employer must present " 'clear, cogent, and convincing evidence,' " *N.T. Enloe Mem. Hosp. v. NLRB*, 682 F.2d 790, 794 (9th Cir.1982) (quoting *NLRB v. Tahoe Nugget, Inc.*, 584 F.2d 293, 297 (9th Cir.1978), *cert. denied*, 442 U.S. 921, 99 S.Ct. 2847, 61 L.Ed.2d 290 (1979)), and must demonstrate that its belief was based on objective considerations. *Bryan Mem. Hosp. v. NLRB*, 814 F.2d 1259, 1262 (8th Cir.), *cert. denied*, 484 U.S. 849, 108 S.Ct. 147, 98 L.Ed.2d 103 (1987). Last, any evidence presented to establish a reasonable good-faith doubt must unequivocally indicate the loss of employee support. *N.T. Enloe Mem. Hosp.*, 682 F.2d at 794.

PP & T limits its arguments to the second prong of the test, i.e., that it had a reasonable good-faith doubt as to its employees' continued majority support for the Union. PP & T points to three sets of objective evidence, all of which were rejected by the Board, to support its position. First, it claims that 24 production and maintenance workers clearly indicated that they were not interested in union representation. While the ALJ found that only nine

of these statements denoted unequivocal expressions of disinterest in union representation, the Board assumed for purposes of its opinion that "the statements of [all] 24 employees ... were a clear repudiation of the Union...." Board Op. at 3. This assumption notwithstanding, the Board concluded that because the statements were not received from a majority of the 54 unit employees when PP & T rejected the Union's recognition request, this evidence did not provide objective support for a good faith belief that the Union did not enjoy majority support.

Moreover, we note that Chairman Stephens agreed with the ALJ that the circumstances of the statement made were "a far cry from a forthright rejection of union representation." All of these employees' statements were made to PP & T management personnel either during job interviews or shortly after being hired and were made against the background knowledge that PP & T intended to open the plant on a nonunion basis. As the Court noted in *Fall River Dyeing & Finishing:*

  after being hired by a new company following a layoff from the old, employees initially will be concerned primarily with maintaining their new jobs. In fact, they might be inclined to shun support for their former union, especially if they believe that such support will jeopardize their jobs with the successor or if they are inclined to blame the union for their layoff and problems associated with it.

482 U.S. at 40, 107 S.Ct. at 2234 (footnote omitted). Because there was not a majority of employees who evinced a desire to forego union representation, we need not decide whether we could infer that the kind of pressure alluded to by the Supreme Court influenced the statements of the employees in this case.

Next, PP & T refers this court to two newspaper articles that it claims suggested that the Union no longer enjoyed majority support. The Board did not discuss these articles in its opinion. Both articles are, at best, ambiguous on the question of Union support by PP & T employees. Such nonspecific indirect evidence cannot provide a basis to overturn the Board's conclusion that the employer had not borne its burden

to show it entertained a good-faith doubt as to union support.

Last, PP & T relies on a petition signed by 34 production and maintenance employees to support its claim. However, the petition, which stated, "We The Workers At Phoenix Pipe & Tube Company wish To have the *Right* to Vote For or against A Union Shop," did not clearly indicate on its face that the signers had decided to reject the Union. As the Board explained, the petition "did not unequivocally repudiate the Union,"· Board Op. at 3, nor did it "indicate a clear intention by the employees not to be represented by the Union." *Id.* at 4 n. 3.

As we noted above, "[e]vidence presenting only ambiguous inference of loss of majority support for the union is not enough [to support a good-faith doubt]." *N.T. Enloe Mem. Hosp.,* 682 F.2d at 795, and the Board's conclusion comports with this view. *See Bryan Mem. Hosp.,* 814 F.2d at 1262 (affidavits claiming that anonymous employees either did not want union or wanted new election too ambiguous to support good-faith doubt of majority support).

Because we find that the Board's conclusions that PP & T is a business successor to Phoenix Steel and that PP & T lacked a reasonable good-faith doubt as to the Union's majority support are supported by substantial evidence, we will enforce the Board's cease and desist order.